UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ROBERT KEAR,

                      Plaintiff,

          -against-

KATONAH LEWISBORO CENTRAL SCHOOL DISTRICT,
KATONAH LEWISBORO CENTRAL SCHOOL DISTRICT
BOARD OF EDUCATION, RICHARD BECKLEY in his
individual capacity as Athletic Director of the Katonah
Lewisboro School District and ROBERT LICHTENFELD in
his individual capacity as Superintendent of the Katonah
Lewisboro School District, and 1-100 unknown administrators,
employees, agents and assigns of the Katonah Lewisboro
Central School District, in both their individual and official
capacities,

                      Defendants.

---

05 CV 7038 (CLB)(MDF)

**DEFENDANTS'
STATEMENT OF
UNDISPUTED MATERIAL
FACTS PURSUANT TO
LOCAL CIVIL RULE 56.1**

Defendants Katonah-Lewisboro Central School District ("School District" or "District"),

Katonah-Lewisboro Central School District Board of Education ("Board of Education"), Richard

Beckley individually and Robert Lichtenfeld individually, submit the following statement of

undisputed material facts pursuant to Rule 56.1 of the Local Civil Rules of the United States District

Court for the Southern District of New York and Fed. R. Civ. P. 56(d):

## STATEMENT OF FACTS

1.     Plaintiff was born on April 2, 1950. [Ex. A, ¶10].

2.     Plaintiff graduated from Springfield College with a Bachelor of Science degree in

1972 and received a Masters in Science from Pace University in or around 1986. [Ex. B at 81-82].

3.     Plaintiff commenced employment with the School District in or about September

1973, and has been continuously employed, on a full-time basis, by the School District since that

date. [*Id.*, ¶10; Ex. B at 6-7].

4.       From 1978 through 1992 or 1993, plaintiff was employed as a part-time physical education teacher and part-time driver's education instructor at John Jay High School ("High School"). [Ex. B at 34-35].

5.       Since 1992 or 1993, plaintiff has been employed as a full-time physical education teacher. [*Id.*]. From 1992 or 1993 through the end of the 2003-2004 school year, plaintiff was employed as a physical education teacher at the High School. [*Id.*].

6.       Plaintiff is certified to teach kindergarten through twelfth grades. [Ex. B at 195].

7.       Since the commencement of the 2004-2005 school year, plaintiff has been employed as a physical education teacher at Meadow Pond Elementary School ("Elementary School"), one of the School District's four elementary schools. [*Id.* at 34].

8.       For the 2006-07 school year, plaintiff's annual income was approximately $103,000, [*Id.* at 40]. Plaintiff is among the highest paid teachers in the School District's athletic department and in the entire School District. [Ex. A, ¶37].

9.       Plaintiff has, at all relevant times, received the compensation that is commensurate with his position in the School District, based upon the number of years of employment within the School District as well as the number of graduate credits he has earned toward his Master's Degree. [Ex. B at 40, 82, 83]. At no relevant time has he been denied raises to which he was entitled from the School District. [*Id.*].

10.       Plaintiff has a benefits package that is commensurate with everyone else that is an employee of the School District. [*Id.* at 83].

11.       Over the years, plaintiff has coached lacrosse, soccer, basketball and wrestling teams

within the School District. [*Id.* at 14-18]. At no relevant time has he been denied benefits to which he was entitled from the School District. [Ex. B at 40, 82, 83].

12.     From approximately 1976 through 2000, plaintiff served as the High School's varsity lacrosse coach. [Ex. B at 14-16]. In 2000, plaintiff earned approximately $4,000 as varsity lacrosse coach. [*Id.* at 16].

13.     From approximately 1973 through 1997 or 1998, with the exception of two years, plaintiff served as a soccer coach in the High School, at times as junior varsity team coach and at times as the freshman team coach. [*Id.* at 15-16]. In his last year as soccer coach, plaintiff earned approximately $3,000. [*Id.* at 16]."[T]here was no particular reason" that plaintiff stopped coaching soccer. [*Id.* at 16].

14.     From approximately 1978 through 2000, and again in the 2005-2006 school year, plaintiff served as a basketball coach in the High School. [*Id.* at 16-17]. He was the junior varsity coach through the mid-1980's and the coach of the freshman team thereafter. [*Id.*]. In his last year as basketball coach, plaintiff earned approximately $3,800. [*Id.* at 17].

15.     Plaintiff has served as a lacrosse and soccer coach for several other school districts since 2002. [*Id.* at 8-12].

16.     Plaintiff served as varsity lacrosse coach for Kennedy Catholic High School ("Kennedy"), Somers, New York, between 2002 and 2004. [*Id.* at 10-11]. He earned approximately $1,200 per season as varsity lacrosse coach at Kennedy. [*Id.* at 11]. Plaintiff was not terminated from this position. [*Id.*]. Plaintiff stopped serving as coach at Kennedy because Danbury High School ("Danbury"), Danbury, Connecticut, "gave me a call so I checked it out." [*Id.*]. Plaintiff described his employment at Kennedy as a "wonderful experience." [*Id.*]. Kennedy is approximately

3

13 miles from the Elementary School.

17.     Plaintiff served as Danbury's lacrosse coach in 2005 and 2006. [*Id.* at 9-10]. Plaintiff earned approximately $3,500 per season as lacrosse coach at Danbury. [*Id.* at 10]. Plaintiff stopped serving as coach at Danbury because "[y]ou need Connecticut state certification on you third year, which I have now but did not have in time for the administrators at Danbury to hire me in February." [*Id.* at 10]. Danbury is approximately 15 miles from the Elementary School.

18.     Plaintiff was hired as junior varsity lacrosse coach at North Salem School District ("North Salem") in March 2007. [*Id.* at 8]. Plaintiff earns approximately $4,200 per season as lacrosse coach at North Salem. [*Id.* at 10]. North Salem is approximately 10.5 miles from the Elementary School.

19.     Plaintiff served as junior varsity soccer co-coach in the Somers School District in 2004 and 2005, and earned approximately $1,500 in that capacity. [*Id.* at 12].

20.     Plaintiff served as junior varsity soccer coach at Kennedy for two or three years in and around the early 2000's. [*Id.*]. His compensation was approximately $1,000. [*Id.*].

21.     On or about October 20, 1999, the Katonah-Lewisboro District Teachers Association ("Association"), on behalf of plaintiff, filed a grievance alleging that the School District's failure to appoint plaintiff as the varsity lacrosse coach for the spring 2000 season violated the collective bargaining agreement ("CBA") between the School District and the Association. [Ex. C, p. 1].

22.     On or about December 14, 1999, after a hearing, the Board of Education denied the grievance. [*Id.*].

23.     Thereafter, plaintiff filed a charge of discrimination against the School District with the Equal Employment Opportunity Commission ("EEOC") entitled *Robert Kear v. Katonah-*

*Lewisboro Board of Education and the Katonah-Lewisboro Union Free School District*, EEOC Charge No. 160A02726, ("EEOC charge") alleging age discrimination arising out of plaintiff's non-appointment to the position of head lacrosse coach for the spring 2000 season. [*Id.*].

24.     On or about March 13, 2001, plaintiff, the School District and the Association entered into an agreement entitled Settlement Agreement General Releases ("Settlement Agreement") resolving the outstanding grievance and EEOC charge. [Ex. C; Ex. A, ¶17].

25.     Pursuant to the terms of the Settlement Agreement, *inter alia*, the Board of Education agreed to, and did, appoint plaintiff as a consultant to the varsity lacrosse coach for the 2000-2001 lacrosse season, under a number of conditions, including that: the existing varsity lacrosse coach, Nicholas Savastano, would remain responsible for all decisions concerning the varsity lacrosse team; Mr. Savastano could receive input from plaintiff on lacrosse team issues as he saw fit; plaintiff as part of his consulting duties could not have any interaction with the lacrosse athletes on the lacrosse team; plaintiff was permitted to be on the sidelines for each game and at all practices; plaintiff would receive the same stipend as Mr. Savastano for his services as a consultant. [*Id.*, ¶5].

26.     A further condition of the Settlement Agreement was that plaintiff "acknowledges and agrees that his appointment as a consultant to the lacrosse coach is for one year and that the Board of Education will not reappoint him for the 2001-2002 season or thereafter. [Plaintiff] agrees that the District has no obligation, contractual or otherwise, to reappoint him to any lacrosse coach position in the District in the future." [*Id.*, ¶5e].

27.     Pursuant to the Settlement Agreement, "the Parties hereto agree that this Agreement may not be modified, altered or changed except by a written Agreement signed by the parties thereto." [*Id.*, ¶14].

5

28.     Plaintiff read the Settlement Agreement, understood the terms of the Settlement Agreement, agreed to the terms of the Settlement Agreement and signed the Settlement Agreement. [Ex. B at 20-21; Ex. C].

29.     At or around the same time, a Memorandum of Agreement on the Reappointment of Coaches ("Memorandum of Agreement") was drafted. [Ex. D].  The draft Memorandum of Agreement set forth proposed procedures for communication with and the reappointment of coaches. [*Id.*].  The draft Memorandum of Agreement contained signature lines for the School District and the Association. [*Id.*].

30.     The Settlement Agreement does not contain any reference to the Memorandum of Agreement. [Ex. C].

31.     The Memorandum of Agreement does not contain any reference to the Settlement Agreement. [Ex. D].

32.     The Memorandum of Agreement was never executed and never made effective. [Ex. D].

33.     During the 2003-2004 school year, the High School physical education department consisted of plaintiff, Joe Mammoser, Nick Savatano, Missy Larzeler, Liz Ferrara and Geoff Curtis. [Ex. B at 73].  Ms. Larzelere was the department chair. [*Id.* at 74].

34.     During the 2003-2004 school year, the physical education department had discussions about creating a ninth grade physical education curriculum. [*Id.* at 116-125].

35.     Plaintiff attended most, if not all, of the physical education department's monthly meetings. [*Id.* at 116-17].

36.     During at least one of the physical education department's monthly meetings, the

6

issue of transferring cardiopulmonary resuscitation and automated external defibrillator ("CPR/AED") training from the health curriculum to the new ninth grade physical education curriculum was discussed. [*Id*. at 118].

37.     In the spring of 2004, CPR/AED training and certification was added to the new ninth grade curriculum, effective for the 2004-2005 school year. [Ex. E]. This required all of the members of the High School's physical education department to be trained to teach CPR/AED. [Ex. E, ¶3].

38.     Plaintiff failed and refused to undergo the CPR/AED training on or about June 17 and 18, 2004. [*Id*. at 158-59; Ex. E, ¶4].

39.     Instead, plaintiff went for a six-mile run, returned to the High School, showered, had lunch, "[k]illed time for a while," then went to hit golf balls at one of the High School's practice fields. [*Id*. at 171-73].

40.     On June 17, 2004, Richard Beckley, Director of the Athletic Department, provided a memorandum to plaintiff expressing his disappointment with plaintiff's "recent commitment of our freshman curriculum in the physical education department." [Ex. F].

41.     On or about June 18, 2004, plaintiff, with his union representative, met with Richard Leprine, Principal of John Jay High School, and Mr. Beckley, regarding plaintiff's refusal to participate in the CPR/AED training on June 17 and 18, 2004. [Ex. B at 178-79; Ex. E, ¶6]. At that meeting, Mr. Leprine informed plaintiff that, given plaintiff's refusal to be trained to become a certified CPR/AED instructor, and resultant inability to deliver the high school physical education curriculum, he would be recommending to the superintendent that plaintiff be transferred to another building for the upcoming school year. [Ex. E, ¶9].

42.     On or about June 29, 2004, plaintiff, with a different union representative, met with

7

Messrs. Leprine and Beckley, again regarding plaintiff's refusal to participate in the CPR/AED training on June 17 and 18, 2004. [Ex. B at 185-88; Ex. E, ¶11]. At that meeting, Mr. Leprine told plaintiff that his position had not changed with regard to his recommendation that plaintiff be transferred from the High School. [Ex. B at 187-88, 191, 195; Ex. E, ¶12.]

43.     By correspondence from Dr. Lichtenfeld, Superintendent of the School District, dated July 23, 2004, plaintiff was informed of the School District's intention to transfer him to an elementary assignment for the 2004-2005 school year. [Ex. G; Ex. B at 198]. As set forth in the letter, "[a]pparently, in your discussion with Rich Leprine and Rich Beckley, you indicated that you are less than committed to the high school physical education curriculum." Plaintiff was advised that he would be informed of his specific elementary school assignment by mid-August 2004. [Ex. G].

44.     By correspondence from Dr. Lichtenfeld dated August 20, 2004, plaintiff was notified that his assignment for the 2004-2005 was to be at the Elementary School. [Ex. H]. Plaintiff was further advised that he was entitled to a meeting for an explanation of the transfer, and was invited to call Dr. Lichtenfeld's office to arrange for an appointment. [Id.].

45.     Plaintiff began working as a physical education teacher at the Elementary School on or about September 7, 2004. [Ex. B at 34].

46.     Thereafter, in the fall of 2004, plaintiff filed a grievance related to his involuntarily reassignment to the Elementary School. [Ex. B at 198-200].

47.     At some point in the fall of 2004, plaintiff had a formal meeting with Dr. Lichtenfeld. [Id. at 204-05].

48.     Plaintiff then proceeded through the grievance process. This included a three-step process, culminating in a Level III hearing before the Board. [Ex. B at 208-13]. At each step, the

8

decision to transfer plaintiff was upheld. [*Id.*].

49.     Thereafter, the matter proceeded to arbitration. [Ex. B at 213]. On June 27, 2005, a hearing was held before arbitrator Margaret S. Leibowitz regarding plaintiff's grievance. [Ex. I].

50.     Both the School District and the Association were represented by counsel at the hearing. [*Id.*].

51.     At the hearing, the parties were afforded a full opportunity to present evidence and argument in support of their respective positions. [*Id.*, p. 1].

52.     The issue to be determined was whether the School District had violated certain provisions of the 2005-2006 Agreement between the School District and the Association when plaintiff was "notified by letter of involuntary assignment, and subsequently involuntarily reassigned from the high school to an elementary school assignment for the 2004-2005 school year." [*Id.*, p. 2].

53.     By Opinion and Award dated January 12, 2006, the arbitrator denied plaintiff's grievance, ruling that the School District had not violated the Agreement between the School District and the Association when it involuntarily reassigned plaintiff to The Elementary School for the 2004-2005 school year. [*Id.* at 19-22].

54.     As set forth in the Opinion and Award:

Holding aside, for the moment, what may have been his concerns about the legitimacy of the new curriculum, his departure from the training room to jog and leave work early, and his repeated refusal to receive CPR/AED training as a means of self-help to protest the change constituted a highly unprofessional temper tantrum. As a general proposition, employees who resort to self-help do so to challenge terms and conditions of employment imposed unilaterally by management. In this case, I am at a loss to understand why the Grievant, a tenured teacher with more than thirty years of service, decided to use self-help to challenge curriculum changes that were developed and implemented by his colleagues during department meetings, rather than to avail himself of the many opportunities to participate in these collegial efforts and offer his co-workers the benefit of his teaching experience and expertise.

[*Id.* at 19-20].

      55.     As also set forth in the Opinion and Award:

As a result of the Grievant's unwarranted and unprofessional conduct, District
management was backed into a corner. Unwilling to take formal disciplinary action
against a long-term teacher and **unable to retain a teacher untrained in all aspects
of the high school physical education curriculum**, the High School Principal
recommended the Grievant's transfer out of the high school and the Superintendent
accepted the recommendation and implemented the reassignment.

[*Id.* at 20][emphasis added].

      56.     School hours in the High School are 7:30 a.m. to 2:30 p.m. [Ex. B at 84]. School

hours at The Elementary School are 8:30 a.m. to 3:30 p.m. [*Id.*].

      57.     Following his transfer from the High School to The Elementary School, the School

District's Athletic Department accommodated plaintiff and his later school schedule at the

Elementary School, so as to allow him to coach the freshman basketball team during the 2005-2006

school year. [*Id.* at 89].

      58.     Following his transfer from the High School to the Elementary School, the other

schools and school districts at which plaintiff coached accommodated plaintiff and his later school

schedule at the Elementary School, so as to allow him to coach those teams. [*Id.* at 90].

      59.     Plaintiff testified that he is aware that the School District accommodated at least one

other teacher at the Elementary School so as to allow him to coach the varsity girls basketball and

varsity boys baseball teams. [*Id.* at 91-92].

      60.     Plaintiff testified that he is aware of at least two of the High School coaches who

taught elsewhere and whose schedules were accommodated by the School District to allow them to

coach according to their particular schedules. [*Id.* at 92-94].

61.     While plaintiff claims that he "lost a position as coach at Somers because it took so
long drive" there, when asked whether he was given a reason by Somers why he was not being
brought back, plaintiff testified, "[n]o, there was no discussion. I just didn't -- I didn't apply; they
didn't call." [*Id.* at 219, 221].

62.     The only other out-of-district positions that plaintiff sought, as of the date of his
deposition on April 9, 2007, were for varsity coaching positions at Somers and junior varsity soccer
positions at North Salem. [*Id.* at 222].  Plaintiff was never given reasons for not receiving those
positions. [*Id.*].


Dated: Hawthorne, New York
       February 8, 2008

                                    TRAUB LIEBERMAN STRAUS & SHREWSBERRY LLP


                                    By: _____
                                         Jonathan R. Harwood (JH9060)
                                         Daniel G. Ecker (DE2017)
                                         Attorneys for Defendants
                                         Mid-Westchester Executive Park
                                         Seven Skyline Drive
                                         Hawthorne, New York 10532
                                         (914) 347-2600

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK      )
                            ) ss.:
COUNTY OF WESTCHESTER  )

      CHRISTINA GOLINO, being duly sworn, deposes and says:

      That deponent is not a part to the within action and is over 18 years of age.

      That on the 8th day of February 2008, deponent served the within **DEFENDANTS'**

**STATEMENT OF UNDISPUTED MATERIAL FACTS PURSUANT TO LOCAL CIVIL**

**RULE 56.1** upon the attorney(s) for the respective party(ies) in this action, at the address listed

below, such address designated by said attorney for that purpose via **ELECTRONIC CASE**

**FILING**.

TO:    Peter Hoffman, Esq.
       Attorneys for Plaintiff
       200 Katonah Avenue
       Village Commons East, 2nd Floor
       Katonah, New York 10536
       Telephone No. (914) 232-2242
       Facsimile No. (914) 232-2245

                                             CHRISTINA GOLINO

Sworn to before me this
8th day of February 2008.

Notary Public

CHRISTOPHER RUSSO
NOTARY PUBLIC, STATE OF NEW YORK
NO. 02RU6128715
QUALIFIED IN WESTCHESTER COUNTY
COMMISSION EXPIRES JUNE 13, 20 09